Frank HUBBARD, Sr. *v.* UNIVERSITY OF
ARKANSAS MEDICAL SCIENCES

81-57                                        616 S.W. 2d 10

Supreme Court of Arkansas
Opinion delivered May 18, 1981

*Central Arkansas Legal Services*, by: *Thomas J. Ginger, James R. Cromwell*, and *Griffin J. Stockley*, for appellant.

*David A. Stewart* and *Nelwyn Davis*, Asst. Atty. Gen., for appellee.

STEELE HAYS, Justice. By this appeal we are asked to construe Act 259 of 1959, the Medical Quota Act, as directing the University of Arkansas for Medical Services to adopt standards for determining medical indigency based on the patient's ability to pay and which follow national and local poverty guidelines. Appellant contends that the Medical Quota Act mandates such standards. We find no provision in the act sustaining that contention.

In December of 1976 appellant's minor daughter became a patient at UAMS for obstetrical care. The putative father agreed to pay the costs and signed a promissory note for monthly payments of $50. Nothing was paid and demand was made on appellant. Appellant's earnings were around $100 a week and he offered the sum of $10 a month, which was declined. Suit was filed and appellant raised the Medical Quota Act as an affirmative defense, which the trial court permitted over the opposition of UAMS. We have serious doubts that the Medical Quota Act may be used as a defense to an action in debt for hospital care; however, the issue is not raised on appeal and we are not willing to raise it ourselves.

Sitting as a jury, the trial court heard testimony from UAMS that it had adopted written financial classification guidelines for indigency based on income and family size; that obstetrical care was classified in a different manner from other services; that every patient was expected to pay some part of the cost; that the amount to be paid was arrived at individually by agreement between the patient and the hospital based on the written guidelines and such additional factors affecting the patient as were deemed relevant; that patients who were dissatisfied could appeal to higher levels of the hospital organization; that under Arkansas law the hospital could not write off a bill but in some cases collection was not pursued; that no one was refused medical care; that the legislative appropriation for the hospital contemplated some payment on behalf of every patient; and that under the hospital's standards appellant's classification, "Class 10," indicated no reduction in cost.

Appellant presented the opinion testimony of an expert witness to show methods of measuring medical indigency for hospital and medical services. The witness discussed various concepts of indigency, including the Community Services Administration standards, established by the Office of Management and Budget, said to be the most widely used. In the opinion of this witness, the UAMS guidelines were totally inadequate to provide free or reduced-cost health care to medical indigents. She offered her own criteria and the opinion that appellant should pay nothing for health care

in Arkansas. On the conflicting evidence, the trial court found that UAMS had adopted standards classifying medical indigents according to income and family size which were reasonably designed to determine indigency and appropriate charges as intended by the Medical Quota Act. Judgment was granted for $1,235.80 as claimed.

On appeal, appellant contends the standards are invalid because they have no rational relationship to the ability to pay and are not related to any national or local poverty standards; that UAMS does not follow the mandate of the Medical Quota Act and does not follow its own guidelines and, even if valid, there is no evidence the standards were applied by UAMS to appellant. He asks that we reverse and remand the case, directing UAMS to establish and adopt uniform standards for classification of indigency and to apply those to appellant.

The argument that there is no evidence that the standards of indigency were applied to appellant lacks merit for several reasons. It is true that neither side presented proof of any substance on the point, and witnesses for the hospital were uncertain whether the standards had been applied to appellant, as was the appellant. However, several exhibits from among the hospital records relative to appellant reflect the classification of "10," or "C10," providing some indication that the standards were applied. We need not determine whether this is sufficient, as it was not the duty of UAMS to produce that evidence. The requirements of the Medical Quota Act, as appellant construes them, were raised by way of affirmative defense and the burden of going forward on those issues belonged to the appellant rather than to the appellee. Appellee's burden of proof was met when it presented a prima facie case of the value of medical services rendered to appellant's minor daughter. Appellant cannot raise affirmative issues and then hold the appellee accountable for a lack of evidence where the testimony on those issues is inconclusive, or in balance. In *White* v. *Williams*, 192 Ark. 41, 89 S.W. 2d 927 (1936), it was said: "It is fundamental that the burden of proof rests with the party who makes the allegation." See, as well, *Baumgartner* v. *Rogers*, 233 Ark. 387, 345 S.W. 2d 476 (1961), and *Widmer* v.

*Ft. Smith Veh. & Mach. Co.*, 244 Ark. 971, 429 S.W. 2d 63 (1968). Moreover, the argument is raised for the first time on appeal and thus the trial court was given no opportunity to consider it; so the issue cannot be presented here. As was pointed out in *Wicks* v. *State*, 270 Ark. 781, 606 S.W. 2d 366 (1980), the burgeoning volume of litigation on appeal makes adherence to this rule imperative.

Appellant's argument that the standards have no rational relationship to the ability to pay and are not related to any national or local poverty standards, standing alone, is not without merit. The problem is that the Medical Quota Act does not provide the necessary foundation on which to construct the argument. The act plainly lacks language making it incumbent on UAMS to adopt specific standards of medical indigency. The nearest thing in the act is that part of Section 4 which "authorizes," without directing, county judges or chief administrative officers of municipalities to establish rules in determining medical indigency. Nothing in the act requires UAMS to adopt its own standards and the fact that it has done so does not make compulsory what appears to have been deliberately discretionary. Appellant has refrained from pointing to particular language in the act in support of his argument, except a part of Section 4:

> It is the purpose and intent of this Act to provide for a fair and equitable apportionment for the use of the facilities and services of the State Medical Center among the various counties of this State, and among all cities having in excess of 10,000 population, for the treatment of medical indigents, and to provide a method and procedure for charging such counties, and cities having over 10,000 population, for services received by medical indigents at the State Medical Center in excess of the allowed quotas.

But even here, instead of the "mandate" appellant speaks of, we find merely the delegating of authority to designated county and municipal officials to act on the matter of indigency. The basic purpose of the act is not to require standards of indigency, but to establish a quota system to distribute proportionately the cost of indigent care among

the counties, using population as a basis. There is the additional provision in Section 2(b) that if a person seeks to use the hospital under the quota system he must first obtain written certification of need from the county judge or chief administrative officer of his municipality. It is admitted that appellant did not follow this procedure, but it also appears that the hospital does not require compliance. However, that issue has not been argued, and we do not treat it here. It is enough to say that appellant's arguments that the CSA guidelines or other standards are a truer index to indigency than those adopted by UAMS, are better addressed to the hospital administration or to the legislature, as it is beyond our function to insert provisions into the act. It is the province of the judicial branch "only to construe the statutes, not to enact them." *Leonard* v. *State*, 95 Ark. 381, 129 S.W. 1089 (1910). The construction and interpretation of statutes must come from the language used in the statutes and not from what the lawmakers may have meant. *State ex rel. Atty. Gen.* v. *Trulock*, 109 Ark. 556, 160 S.W. 516 (1913).

It is often said that the cardinal principle of statutory construction is to declare the intention of the legislature. *Ark. State Hwy. Comm.* v. *Mabry*, 229 Ark. 261, 315 S.W. 2d 900 (1958). Our duty is to interpret the statutes *as they read* and not as we might have them read. *City of N.L.R.* v. *Montgomery*, 261 Ark. 16, 546 S.W. 2d 154 (1977). With that in mind, it would be impossible to say that there is any expressed intent in Act 259 that the UAMS adopt a specific standard of medical indigency, such as the CSA guidelines, and difficult to say that the act created more than an inference that standards of indigency are required. We think the trial court correctly held that the standards adopted by UAMS, although not what appellant would like them to be, are reasonably well designed to determine medical indigency and make appropriate charges, as intended by the act. The holding is supported by substantial evidence.

Affirmed.

HOLT, J., not participating.